**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| COMBAT MEDICAL SYSTEMS, LLC, a North Carolina Limited Liability Company, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:15CV258 |
| | ) | |
| ATHENA GTX, INC., an Iowa Corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Athena GTX, Inc.'s ("Athena") Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Transfer of Venue Pursuant to 28 U.S.C. § 1404 (Doc. #6, referred to as "Athena's Motion to Dismiss") and Plaintiff Combat Medical Systems, LLC's ("CMS") Alternative Motion for Jurisdictional Discovery (Doc. #11, referred to as "CMS's Motion for Jurisdictional Discovery"). Both motions have been fully briefed and are ripe for review. For the reasons explained below, Athena's Motion to Dismiss is denied without prejudice to renewing its motion at the completion of jurisdictional discovery, and CMS's Motion for Jurisdictional Discovery is granted in part and denied in part.

I.

CMS, a North Carolina limited liability company, develops and
distributes "innovative medical products, devices[,] and supplies that
simplify tactical medical care" to the U.S. Department of Defense, safety
and law enforcement agencies, and emergency medical workers. (Compl. ¶
14 (Doc. #3).)  Athena, an Iowa corporation, is a development company that
also sells wireless medical monitoring products for trauma injury care and
telemedicine needs worldwide. (Darrah Aff. ¶¶ 5, 7 (Doc. #7-1).)

In December 2009, CMS and Athena entered into a Distribution
Agreement ("Agreement"), according to which CMS would serve as
Athena's exclusive world-wide distributor of wireless vital signs monitoring
units ("WVSM Units") and had the option of serving as the exclusive
distributor for the "Mini-Medic" once the Food and Drug Administration
("FDA") cleared it for marketing. (Compl. Ex. A.)  In January 2012, they
executed an Addendum to the Agreement which provided, among other
things, that CMS could require Athena to buy back incremental inventory of
WVSM Units and that Athena would pay CMS commissions for any WVSM
Units Athena sold. (Compl. Ex. B.)  It is Athena's alleged failure to abide by
its obligations in the Addendum that is the subject of the instant action.

2

In an affidavit, CMS's CEO Lisa Tweardy avers that a business relationship existed between CMS and Athena as a result of a prior working relationship between Athena's CEO Mark Darrah and CMS's Vice President of Research and Development Chris Murphy. (Tweardy Aff. ¶¶ 2, 9 (Doc. #9-1).)[1] However, CMS does not allege any facts as to which party initiated contact with the other to begin negotiations for the Agreement between Athena and CMS. The only evidence of the beginning of the specific business relationship at issue comes from Athena. In an affidavit, Darrah avers that, in 2009, CMS approached Athena to serve as Athena's exclusive world-wide distributor of certain Athena products. (Darrah Aff. ¶ 11.) CMS's then-CEO and its President flew to Texas to meet with Darrah, among others, at Athena's San Antonio offices about CMS's proposed distributorship. (Id. ¶ 12.)

CMS alleges that, during the negotiations: (a) Athena initiated telephone calls, emails, and other written correspondence in connection with the contract at issue, (b) Athena's owner participated in conference calls with CMS to discuss wireless medical monitors that Athena could provide to

---

[1] Tweardy suggests that Murphy may have more information as to the business relationship, both generally and specific to the Agreement at issue, between CMS and Athena. (Tweardy Aff. ¶ 9.) At the time Tweardy submitted her affidavit in April 2015, Murphy was deployed in a combat zone. (Id.)

3

CMS, (c) Athena's officers participated in conference calls and emails with CMS to discuss, promote, and negotiate the terms of a contract with CMS for the sale of WVSM Units to CMS, and (d) Athena sent a proposed distribution agreement to CMS. (Compl. ¶ 7(a)-(d).) Athena adds that the parties also discussed a forum selection clause. (Darrah Aff. ¶ 21.) Athena rejected CMS's requests that New York or North Carolina serve as the chosen forum and, instead, required the forum to be California, where it was then incorporated. (Id. ¶¶ 22-23.)

As a result of these negotiations, in December 2009, CMS entered into the Distribution Agreement with Athena. (Compl. ¶ 2; Compl. Ex. A at 1.) According to the Agreement, CMS would serve as Athena's exclusive world-wide distributor of specific products, including WVSM Units. (Compl. Ex. A at 1-2.) To retain its exclusivity, CMS was required to make certain quarterly purchases at an agreed-upon unit price. (Id. at 2, 13.) CMS was required to purchase 50 WVSM Units the first and second quarters, 100 the third quarter, 150 the fourth quarter, 200 the fifth quarter, and 250 the sixth quarter, for a total of 800 units by the end of the sixth quarter. (Id. at 13.)

Although the Agreement provided that Athena would ship directly to CMS's customers as directed, CMS has alleged that Athena shipped the

4

WVSM Units to CMS in North Carolina. (Compl. ¶ 7.f.; Compl. Ex. A at 3.)
As part of this process, Athena agreed to send CMS invoices for the
products it delivered, and CMS agreed to provide Athena with purchase
orders for the specific products it ordered. (Compl. Ex. A at 3.)  The term of
the Agreement was eighteen months with the option to renew for a period
of one year. (Id. at 6.)  The parties agreed that California law would govern
any disputes about the Agreement. (Id. at 10.)

According to both Tweardy and Darrah, after the parties executed the
Agreement, an Athena employee traveled to CMS's office in Fayetteville,
North Carolina to train CMS's sales staff on the sale of Athena's products.
(Tweardy Aff. ¶ 11; Darrah Aff. ¶ 33.)  Tweardy asserts that, during the
course of the Agreement, Athena routinely initiated email and telephone
communications with CMS. (Tweardy Aff. ¶ 11.)  Pursuant to the
Agreement, Athena ultimately shipped 400 WVSM Units to CMS on eight
separate occasions between March 2011 and April 2012 for which CMS
paid Athena in incremental payments totaling $1,160,000. (Id. ¶¶ 12, 13.)

In January 2012, CMS and Athena executed an Addendum to the
Agreement which included, among other terms, CMS's right to request
Athena to buy back CMS's incremental inventory of 300 WVSM Units,
Athena's right to sell WVSM Units, and Athena's obligation to pay CMS a

5

commission of $2,350 for each of the WVSM Units Athena sold. (Compl. Ex. B.)

According to CMS, in July 2012, it exercised its buy-back rights under the Addendum, and Athena represented that it would purchase WVSM Units from CMS per the terms of the Addendum. (Compl. ¶¶ 28-30; Tweardy Aff. ¶ 15.) CMS shipped 237 WVSM Units back to Athena between May 2012 and April 2015. (Tweardy Aff. ¶ 16.) However, CMS alleges that Athena did not comply with the terms of the Addendum. Although Athena has paid $272,119 for the returned WVSM Units, CMS alleges that Athena still owes $182,185. (Id. ¶ 17.) In addition, CMS alleges that Athena owes CMS for the remaining WVSM Units and is wrongfully retaining commissions. (Compl. ¶¶ 30-46.) As a result, CMS filed the instant action.

CMS alleges that the Court has general and specific personal jurisdiction over Athena pursuant to North Carolina General Statutes §§ 1-75.4 and 1.75-8. (Id. ¶ 5.) In addition to its allegations and averments of Athena's contact with CMS in North Carolina regarding the Agreement and its Addendum, CMS alleges that "Athena is engaged in substantial activity within North Carolina" through the sale of the WVSM Units that CMS agreed to sell and other WVSM Units sold by Athena to other North Carolina distributors. (Id. ¶ 7.e.) CMS also alleges that "Athena visited potential

6

distributors and business partners" in North Carolina and that "Athena has such other and further contacts with North Carolina such that personal jurisdiction over Athena in North Carolina is appropriate." (Id. ¶¶ 7.i., 7.j.)

Athena has moved to dismiss, arguing that this Court lacks personal jurisdiction over it, and, in the alternative, has moved to transfer venue to the Southern District of California per the Agreement's forum selection clause. Darrah asserts that Athena does not own property in or maintain offices in North Carolina and that Athena's only in-person contact with CMS in North Carolina was when its employee trained CMS's sales staff. (Darrah Aff. ¶¶ 9, 33.)

In response, CMS has moved for jurisdictional discovery should the Court find that the evidence before it does not support exercising personal jurisdiction over Athena. (Doc. #11.) In addition to seeking discovery on information specifically related to the parties' interactions with respect to the Agreement, CMS seeks discovery on Athena's: (a) total sales and offers for sale in North Carolina, (2) overall revenues from sales of all products in the United States to determine the proportion of sales comprised by transactions with North Carolina entities, (3) marketing efforts of shipping, directly or indirectly, into North Carolina, and (4) distribution and marketing

in North Carolina through Athena's U.S. and non-U.S. subsidiaries, if any.
(Id. at 2.)

II.

A.

When a defendant asserts a Rule 12(b)(2) challenge to a court's personal jurisdiction, the question is one for the court and the plaintiff bears the burden to prove the existence of a ground for personal jurisdiction. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). Although the plaintiff's burden is usually a preponderance of the evidence, when, as here, the court addresses the question of personal jurisdiction on the basis of the motion papers, supporting legal memoranda, relevant allegations of the complaint, and supporting affidavits, the plaintiff has the burden of making a prima facie showing in support of jurisdiction. Id.; Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014). A plaintiff makes a prima facie showing of personal jurisdiction by presenting facts that, if true, would support jurisdiction. Mattel, Inc. v. Greiner & Hausser GmbH, 354 F.3d 857, 862 (9th Cir. 2003) cited in Universal Leather, 773 F.3d at 561. Absent an evidentiary hearing, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676; see also Universal Leather, 773 F.3d at 560

8

(requiring the court to assume the plaintiff's version of the facts is credible and to construe any conflicting facts in the affidavits in the light most favorable to the plaintiff). However, "[t]he allegations of the complaint are taken as true only if they are not controverted by evidence from the defendant." Vision Motor Cars, Inc. v. Valor Motor Co., 981 F. Supp.2d 464, 468 (M.D.N.C. 2013) (citing Wolf v. Richmond Cty. Hosp. Auth., 745 F.2d 904, 908 (4th Cir. 1984)). When a defendant presents evidence that the court lacks personal jurisdiction, the plaintiff must present affidavits or other evidence to the contrary. Id. (citing Clark v. Remark, 993 F.2d 228 (Table), 1993 WL 134616, *2 (4th Cir. April. 29, 1993)). If both sides present evidence about personal jurisdiction, the court must resolve factual conflicts in the plaintiff's favor "for the limited purpose" of determining if the plaintiff has made a prima facie showing. Id. (citing Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 62 (4th Cir. 1993)).

A federal court may exercise personal jurisdiction over a non-resident defendant only if the forum state's long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with the Fourteenth Amendment due process requirements. Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). North Carolina's long-arm statute, General Statute § 1-75.4, "is designed to

9

extend jurisdiction over nonresident defendants to the fullest limits permitted by the Fourteenth Amendment's due-process clause." Church v. Carter, 94 N.C. App. 286, 290, 380 S.E.2d 167, 169 (1989); see also Christian Sci. Bd. of Dirs., 259 F.3d at 215 (stating same). Thus, the court's focus becomes whether the plaintiff has made a prima facie showing that the defendant's contacts with North Carolina satisfy constitutional due process. Universal Leather, 773 F.3d at 558-59.

B.

Due process allows a court to exercise specific or general jurisdiction over a defendant. Specific jurisdiction exists when the forum state exercises personal jurisdiction over the defendant "in a suit arising out of or related to the defendant's contacts with the forum[.]" Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 8 (1984). When a court exercises jurisdiction over a defendant in a suit that does not arise out of or is not related to the defendant's contacts with the forum state, the court exercises general jurisdiction, but can only do so if the defendant's contacts with the state are "so 'continuous and systematic' as to render [it] essentially at home in the forum State." Daimler AG v. Bauman, ___ U.S. ___, 134 S. Ct. 746, 761 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, ___ U.S. ___, 131 S. Ct. 2846, 2851 (2011)).

10

1.

To exercise specific jurisdiction over a defendant, due process requires that the court examine "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).

The inquiry into "purposeful availment . . . is grounded on the traditional due process concept of 'minimum contacts[.]'" Universal Leather, 773 F.3d at 559. A resident's contract with a non-resident defendant is not by itself sufficient to establish sufficient minimum contacts with the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985). Because the contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction[,]" a court must evaluate "prior negotiations[,] contemplated future consequences, . . . the terms of the contract[,] and the parties' actual course of dealing[.]" Id. at 479. In the business context, courts analyze "various nonexclusive factors" to determine if a defendant

11

has purposefully availed itself of the privilege of conducting activities in the

state, including, but not limited to:

- whether the defendant maintains offices or agents in the
  forum state,
- whether the defendant owns property in the forum state,
- whether the defendant reached into the forum state to solicit
  or initiate business,
- whether the defendant deliberately engaged in significant or
  long-term business activities in the forum state,
- whether the parties contractually agreed that the law of the
  forum state would govern disputes,
- whether the defendant made in-person contact with the
  resident of the forum in the forum state regarding the
  business relationship,
- the nature, quality and extent of the parties' communications
  about the business being transacted, [and]
- whether the performance of contractual duties was to occur
  within the forum[.]

Consulting Eng'rs Corp., 561 F.3d at 278 (citations omitted).  Although

several of these factors involve the physical presence of a defendant in a

forum state, "[s]o long as a commercial actor's efforts are 'purposefully

directed' toward residents of another State, [the Supreme Court has]

consistently rejected the notion that an absence of physical contacts can

defeat personal jurisdiction there." Burger King Corp., 471 U.S. at 475.  On

the other hand, "the Fourth Circuit has given great weight to the question of

who initiated the contact between the parties." Pan-Am. Prods. & Holdings,

LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 682 (M.D.N.C. 2011).

12

Here, Athena presented uncontroverted evidence that it neither maintains offices nor owns property in North Carolina. (Darrah Aff. ¶ 9.) Both parties agree that Athena made one in-person contact after the Agreement was executed to train CMS's sales staff, which implies that Athena also does not maintain agents in North Carolina. (Darrah Aff. ¶ 33; Tweardy Aff. ¶ 11.) In addition, at no time during negotiations did anyone from Athena visit CMS in North Carolina. (Darrah Aff. ¶ 19.) While a single in-person contact does not provide significant support for a finding of personal jurisdiction, the lack of any other physical presence in North Carolina would not by itself defeat jurisdiction.

The only evidence before the Court on whether Athena reached into North Carolina to solicit or initiate the Agreement, the factor to which the Fourth Circuit gives great weight, is Darrah's uncontroverted averment that CMS's then-CEO and President flew to Texas to meet with Athena at its San Antonio office to discuss CMS's proposal to serve as Athena's exclusive world-wide distributor. (Id. ¶ 12.) Tweardy avers that the business relationship between CMS and Athena resulted from a prior working relationship between Murphy and Darrah (Tweardy Aff. ¶ 9), but this is not evidence specific to the Agreement at issue. Neither Tweardy's assertion nor the allegation in the Complaint that Athena "initiated communications

13

with CMS[] . . . <u>in connection with the contract at issue</u>" (Compl. ¶ 7) (emphasis added) contradict the only evidence on the issue of whether Athena reached into North Carolina to solicit or initiate business. <u>See</u> <u>Pan-Am. Prods. & Holdings, LLC</u>, 825 F. Supp. 2d at 682 ("[T]he FAC is significant for what it does not say. [The plaintiff] has not alleged that . . . Defendants, or their agents, initiated contact with [the plaintiff] regarding the [products at issue], despite this fact being within the direct knowledge of [the plaintiff].")

Furthermore, instead of agreeing that North Carolina law would govern disputes, the parties actually contracted that the Agreement would "be governed by and construed in accordance with the laws of the State of California, excluding its conflict of laws rule." (<u>See</u> Compl. Ex. A at 10.) <u>Cf.</u> <u>Burger King Corp.</u>, 471 U.S. at 482 (recognizing that the parties' agreement that the law of the <u>forum</u> state would govern disputes alone is insufficient to confer jurisdiction, but when combined with the business relationship, "it reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there") (emphasis added). In addition, the uncontroverted evidence is that, during negotiations, the parties "specifically discussed and negotiated both verbally and in writing" the forum selection clause. (Darrah Aff. ¶ 21.) Athena refused CMS's

14

requests that New York or North Carolina serve as the exclusive jurisdiction and required that the Southern District of California be the exclusive jurisdiction and venue. (Id. ¶¶ 22-24.)

In addition, although the parties' performance of some of their contractual duties was to occur within North Carolina, this factor does not sufficiently support personal jurisdiction either. "An agreement coupled with a plaintiff's performance of some contractual obligations in the forum do not show sufficient contacts by the defendant with the forum." Sloane v. Laliberte, No. 1:08CV381, 2011 WL 2938117, at *9 (M.D.N.C. July 19, 2011) (finding that the plaintiffs' partial performance of work within North Carolina did not warrant the exercise of personal jurisdiction when the defendant's performance occurred in Canada and the plaintiffs directed activities into Canada), adopted (M.D.N.C. Sept. 15, 2011); see also Pan-American Prods. & Holdings, LLC, 825 F. Supp. 2d at 683 ("There is an important distinction . . . between alleged contacts with a forum arising simply from a plaintiff's location and promise to perform some services there, on the one hand, and situations where a defendant has purposefully directed activities toward the state, on the other hand.").

Athena obligated itself to, among other things, offer for sale and supply certain products to CMS, send CMS invoices for the products

delivered to CMS, acknowledge in writing each purchase order CMS provided, warehouse products and drop ship those products to CMS's customers as directed at CMS's option, and buy-back incremental inventory and pay CMS a commission on Athena's sales of WVSM Units should CMS exercise its buy-back rights. (Compl. Exs. A, B.)  Meanwhile, CMS obligated itself to, among other things, purchase certain products from Athena, sell and distribute those products world-wide to governments and their subdivisions for use by their military, security, or law enforcement branches, provide Athena with purchase orders for products, and pay Athena by check or wire for products purchased. (Id.)  As is evident, the parties contracted to perform at least some of their duties in North Carolina, including Athena's sending invoices to and CMS's receipt of invoices in North Carolina, Athena's purchase of incremental inventory from CMS, and Athena's payment to CMS of commissions.  In addition, Athena actually shipped the 400 WVSM Units directly to CMS, according to Tweardy. (Tweardy Aff. ¶ 12.)

However, other contractual duties were to be performed outside of North Carolina, including CMS's sale of products world-wide.  As Darrah averred, and CMS has not disputed, because "CMS would be attempting to distribute and sell Athena's products world-wide to the market it served, the

fact that CMS was located in North Carolina was immaterial[;] CMS could have been located anywhere." (Darrah Aff. ¶ 13.)  In further support of this statement, Darrah explained that, at the time CMS visited Athena's San Antonio offices, "Athena was entertaining competing bids from alternative distributors" outside of North Carolina. (Id. ¶ 15.)  "Where the bidding companies were located was of no consequence to Athena.  Athena was not intent on establishing a distributor or relationship with a particular forum; rather, Athena was seeking capable distributors in the markets desired to sell its products world-wide." (Id. ¶ 17.)  CMS's world-wide distributorship coupled with its performance of some contractual obligations in North Carolina is insufficient to support a finding of minimum contacts with North Carolina.

While these factors above weigh against the exercise of personal jurisdiction, other factors support a finding of sufficient minimum contacts. For example, the Agreement and its associated Addendum contemplated an ongoing relationship, rather than a single transaction, between the parties. (See Compl. Exs. A, B). See Fatboy USA, LLC v. Schat, No. 1:07CV965, 2009 WL 3756947, *6 (M.D.N.C. Nov. 6, 2009), adopted (M.D.N.C. Mar. 1, 2010) (noting that an ongoing relationship "weighs towards" personal jurisdiction).  The term of the Agreement, entered into in December 2009,

17

was eighteen months with the option to renew for one year. (Compl. Ex. A at 6.)  Over two years later, in January 2012, the parties executed the Addendum. (See Compl. Ex. B.)

Furthermore, the Agreement required CMS to purchase numerous WVSM Units each quarter, with increasing purchase requirements over time, totaling 800 WVSM Units to be purchased by the end of the sixth quarter. (Compl. Ex. A at 2, 13.)  According to Tweardy, although CMS only purchased 400 WVSM Units over eight separate occasions by April 2012, it paid Athena $1,160,000.00 for those units. (Tweardy Aff. ¶¶ 12, 13.)  In addition, the Addendum contemplated that CMS could exercise buy-back rights according to which Athena would be required to purchase 300 WVSM Units from CMS for the price CMS had paid Athena. (Compl. Ex. B.)  Athena also agreed that it would pay CMS a commission of $2,350 for each WVSM Unit Athena sold. (Id.)

The length of the term of the Agreement, the parties' obligations throughout the term of the Agreement, the quantity of WVSM Units CMS was required to purchase for exclusivity, the quantity of WVSM Units CMS actually purchased and could thereafter require Athena to buy back, and the money exchanged pursuant to the Agreement and the Addendum support a finding that the parties intended their business activity to be significant and

18

long-term. See, e.g., Hanes Cos., Inc. v. Galvin Bros., Inc., No. 1:09CV918, 2013 WL 594013, *10 (M.D.N.C. Feb. 15, 2013), adopted (M.D.N.C. Mar. 11, 2013) (noting "[t]he size of the contract is relevant in determining whether [an out-of-state defendant's] actions directed toward [the plaintiff's home-state] were sufficient to establish personal jurisdiction" and finding factor favored jurisdiction where contract's value was approximately $2,000,000 and required numerous shipments over a period of months) (alterations in original); Cortex Surveillance Automation, Inc. v. Sec. Integrators & Consultants, Inc., No. 1:05CV562, 2006 WL 994951, *3 (M.D.N.C. Apr. 12, 2006) (finding agreement that forecasted "an ongoing relationship between the parties comprised of numerous transactions" strongly suggestive of jurisdiction where the term of the agreement was at least two years, numerous orders were placed over the course of approximately two and a half years totaling $117,300.00, and the agreement contemplated hours of technical support, training and assistance for the product).

In addition, the nature, quantity, and extent of the parties' communications, when construed in the light most favorable to CMS, support a finding of sufficient minimum contacts. See Hanes Cos., Inc., 2013 WL 594013, at *13 (finding this factor favored personal jurisdiction

19

because evidence showed the exchange of at least a dozen emails during negotiations with at least seven of those from the defendant, highly substantive communications during negotiations, the defendant's routine telephone calls to the plaintiff in North Carolina, the exchange of at least forty emails during the performance of the contract, and the defendant's payment of $1,445,720.06 to the plaintiff by nine separate checks).

CMS alleges that (a) Athena initiated telephone, email, and other written communications with CMS's officers and employees in North Carolina in connection with the Agreement, (b) Athena's owner participated in conference calls with CMS's officers in North Carolina to discuss Athena's wireless medical monitors, (c) Athena's officers participated in conference calls and emails with CMS's officers in North Carolina to discuss, promote, and negotiate the terms of a contract with CMS to sell WVSM Units, and (d) Athena sent a proposed distribution agreement and addendum to CMS in North Carolina. (Compl. ¶ 7.)  Tweardy avers that throughout the course of the Agreement, "Athena routinely initiated contact with CMS in North Carolina through both email and telephone communications." (Tweardy Aff. ¶ 11.)

Athena shipped 400 WVSM Units on eight separate occasions for which CMS made numerous incremental payments. (Id. ¶¶ 12, 13.)

According to the Agreement, these exchanges were accompanied by invoices and purchase orders. (Compl. Ex. A at 3.) When CMS exercised its buy-back rights under the Addendum, it shipped 237 WVSM Units to Athena on eleven separate occasions, several shipments of which were accompanied by a purchase order from Athena. (Tweardy Aff. ¶ 16.) In sum, this factor favors finding that Athena had sufficient minimum contacts with North Carolina.

Nevertheless, after weighing all of the factors outlined in Consulting Engineers Corp., it is determined that CMS has failed to allege or present evidence of the presence of sufficient factors to warrant a finding that Athena purposefully availed itself of the privilege of doing business in North Carolina. Of the eight factors recognized in Consulting Engineers Corp., three support a finding of sufficient minimum contacts. Athena deliberately engaged in significant and long-term business activities with CMS in North Carolina; Athena sent an employee to North Carolina to train CMS sales staff; and the parties communicated substantively during the negotiation and performance of the Agreement. However, the uncontroverted evidence of the five other factors does not support a finding that Athena purposefully availed itself of the privilege of doing business in North Carolina. Not only does Athena not maintain offices or agents in North Carolina, it does not

own property in North Carolina.  More significantly, though, it did not reach into North Carolina to solicit or initiate the Agreement with CMS.  In addition, the parties contracted for California law to govern their disputes over the Agreement, and, while some of the contractual duties were to be performed in North Carolina, others were not.  Indeed, CMS was to distribute WVSM Units world-wide.  As a whole, this evidence does not support a finding that Athena invoked the "benefits and protections" of North Carolina law, Hanson v. Denckla, 357 U.S. 235, 253 (1958), such that it could "reasonably anticipate being haled into court" in North Carolina, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Because CMS has not made a prima facie showing that Athena purposefully availed itself of the privilege of doing business in North Carolina, the remaining two factors for the exercise of specific jurisdiction will not be addressed.

2.

Despite CMS's allegation that its "claims against Athena arise out of and relate to Athena's activities within North Carolina,]" CMS also alleges that this Court has general jurisdiction over Athena. (Compl. ¶¶ 6, 7, 8.) "[T]he paradigm forum for the exercise of general jurisdiction is . . . one in which the corporation is fairly regarded as at home." Goodyear Dunlop Tire

22

Operations, S.A., ___ U.S. ___, 131 S. Ct. at 2853-54 (citing Brilmayer et al., A General Look at General Jurisdiction, 66 Tex. L. Rev. 721, 728 as "identifying domicile, place of incorporation, and principal place of business as 'paradig[m]' bases for the exercise of general jurisdiction"). While "Goodyear did not hold that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business[,]" it is not enough that the corporation "engages in a substantial, continuous, and systematic course of business" in the forum state. Daimler AG, ___ U.S. ___, 134 S. Ct. at 760, 761. Instead, general jurisdiction exists when a corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." Id., ___ U.S. ___, 134 S. Ct. at 761 (quoting Goodyear Dunlop Tire Ops., S.A., ___ U.S. ___, 131 S. Ct. at 2851).

In Goodyear, the jurisdictional defendants, Goodyear's foreign subsidiaries, were not registered to do business in North Carolina; had no place of business, employees, or bank accounts in North Carolina; did not design, manufacture, or advertise their products in North Carolina; did not solicit business in North Carolina; and did not themselves sell or ship tires to North Carolina customers. ___ U.S. ___, 131 S. Ct. at 2852. Other Goodyear affiliates did distribute a small percentage of the jurisdictional

defendants' tires within North Carolina, but the tires at issue were never distributed in North Carolina. Id., 131 S. Ct. at 2852.  These facts did not support the exercise of general jurisdiction over the foreign subsidiaries. Id., 131 S. Ct. at 2856-57.  The jurisdictional defendants were "in no sense at home in North Carolina[,]" and "[t]heir attenuated connections to the State . . . fall far short of the continuous and systematic general business contacts necessary to empower North Carolina to entertain suit against them on claims unrelated to anything that connects them to the State." Id., 131 S. Ct. at 2857.

Here, CMS asserts that "Athena is engaged in substantial activity within North Carolina" through its sale of WVSM Units to other distributors in North Carolina, that Athena conducted business "with others in North Carolina[,]" that "Athena visited potential distributors and business partners . . . in North Carolina[,]" and more generally that "Athena has such other and further contacts with North Carolina such that personal jurisdiction over Athena in North Carolina is appropriate." (Id. ¶ 7.)

CMS cites Taltwell, LLC v. Zonet USA Corp., No. 3:07CV543, 2007 WL 4562874, at *7 (E.D. Va. Dec. 20, 2007) for the proposition that "a broad distributorship network in a forum state that generates a substantial amount of revenue for the defendant may warrant general jurisdiction."  The

Federal Circuit case that the Taltwell court cites in support of the aforementioned statement involved a defendant, incorporated in Connecticut with a principal place of business in Virginia, that was sued in Ohio. LSI Indus. Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1370 (Fed. Cir. 2000). That defendant "employ[ed] multiple distributors in Ohio and net[ted] several million dollars per year from sales in Ohio." Id.

CMS argues that "Athena has done more than distribute a few items to North Carolina" and that its actions pursuant to the Agreement create a "contact [that] gives this Court general jurisdiction over Athena." However, there is no evidence, as there was in LSI Industries, Inc., that Athena has a broad distributorship in North Carolina nor has CMS alleged the existence of such a network of distributors. Darrah acknowledges that Athena has entered into other distribution agreements for its products, but there is no indication as to whether those distributors are in North Carolina, whether they distribute products in North Carolina, or whether their sales in North Carolina generate net revenue for Athena. (See Darrah Aff. ¶ 27.) In fact, the evidence is that CMS was, for a time, the only world-wide distributor of WVSM Units and had the option of serving as the exclusive distributor of the "Mini-Medic" once the FDA provided marketing clearance. (Compl. Ex. A.)

25

Athena argues that because CMS cannot establish specific jurisdiction over Athena, general jurisdiction is also lacking. (Doc. #7 at 13.)  However, even where there is no specific jurisdiction, "general jurisdiction may exist when the defendant has sufficient contacts with the forum State." ALS Scan, Inc., 293 F.3d at 715.  Athena argues that it does not maintain offices or a place of business in North Carolina and does not own property in North Carolina. (Doc. #7 at 13.)  In addition, Athena is not incorporated in North Carolina. (Darrah Aff. ¶ 7 (averring that in 2009, Athena was a California corporation and, in 2012, became an Iowa corporation); Compl. ¶ 3 (alleging that Athena is incorporated in Iowa).)[2]

In sum, there is simply no evidence before the Court that Athena has sufficient continuous and systematic contacts with North Carolina such that it is essentially at home in North Carolina.  The exercise of general jurisdiction over Athena, at this time, is improper.  However, because the Court exercises its discretion to permit CMS to conduct limited discovery on whether Athena is subject to general jurisdiction, Athena's Motion to

---

[2] Athena has proffered uncontroverted evidence that it does not maintain offices in or own property in and is not incorporated in North Carolina (Darrah Aff. ¶¶ 7, 9), but it does not offer evidence of, or even argue that, it does not otherwise conduct sufficient business in North Carolina that would support the exercise of general jurisdiction.  This, among other reasons, supports the Court's determination to grant, in part, CMS's Motion for Jurisdictional Discovery, infra 27-32.

Dismiss is denied without prejudice to refiling after the close of jurisdictional discovery.

## III.

Although CMS argues that it has satisfied its prima facie burden of showing that Athena is subject to personal jurisdiction in this Court, it argues that it "is entitled to jurisdictional discovery[.]" (Doc. #9 at 13.) CMS seeks discovery "related to the circumstances under which either party 'initiated' contact that resulted in the execution of the parties' Distribution Agreement . . . [and] to the extent of the communications between Athena and CMS from December 2009 to present." (Doc. #11 at 2.) Because this information is within CMS's personal knowledge, this portion of CMS's motion is denied.

CMS also seeks discovery related to the Court's exercise of general jurisdiction, including, "at least[,]" Athena's: (1) total sales and offers for sale in North Carolina, (2) overall revenues from sales of all products in the United States to determine the proportion of sales comprised by transactions with North Carolina entities, (3) marketing efforts of shipping, directly or indirectly, into North Carolina, and (4) distribution and marketing in North Carolina through Athena's U.S. and non-U.S. subsidiaries, if any. (Id.)

27

A court has discretion to grant discovery on the question of personal jurisdiction. See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 402-03 (4th Cir. 2003); see also Rich v. KIS Ca., Inc., 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("When plaintiff can show that discovery is necessary in order to meet defendant's challenge to personal jurisdiction, a court should ordinarily permit discovery on that issue unless plaintiff's claim appears to be clearly frivolous."). However, when a plaintiff offers no more than speculation or conclusory assertions about a defendant's contacts with the forum state, "a court is within its discretion in denying jurisdictional discovery." Carefirst of Md., Inc., 334 F.3d at 402. This is particularly the case when the defendant makes specific denials of jurisdiction and, in response, the plaintiff makes conclusory allegations in support of jurisdiction. See Rich, 121 F.R.D. at 259 ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited [jurisdictional] discovery . . . should it conclude that such discovery will be a fishing expedition.") cited in Carefirst of Md., Inc., 334 F.3d at 403; see also ALS Scan, Inc., 293 F.3d at 716 n. 3 (affirming the denial of the plaintiff's motion for jurisdictional discovery where the plaintiff made conclusory allegations in support of its motion,

28

failed "to proffer any further facts that it could demonstrate that would be material to the limited jurisdictional ruling[,]" and did not suggest that the defendant's asserted jurisdictional facts were inaccurate).

Here, neither party provides detailed allegations in support of its argument. In the face of CMS's Motion for Jurisdictional Discovery, Athena merely states in a one-page opposition brief[3] that such discovery is "unnecessary and unwarranted" and that it relies on its "positions stated" in its brief in support of its Motion to Dismiss and its reply brief in further support. (See Doc. #13.) In its brief in support of its motion[4], Athena simply argues that it does not maintain offices or a place of business in North Carolina and does not own property in the state. (Doc. #7 at 13.)

What is even more enlightening than this argument are Darrah's averments in support of Athena's Motion to Dismiss. He never states and Athena never argues that it does not conduct business in North Carolina with companies other than CMS. All of Darrah's protestations of contact with North Carolina are specific to CMS. For example, he states, "I have

---

[3] The substance of the brief is one page. The date and counsel's signature constitute the entirety of the second page. The certificate of service is the third page. (See Doc. #13.)

[4] Athena does not actually further its argument against general jurisdiction in its reply brief. Instead, it focuses on the lack of specific jurisdiction (Doc. #12 at 1-3) and the validity of the forum selection clause (id. at 3-6).

never visited CMS in North Carolina; nor have I ever spoken to CMS representatives while being present in North Carolina" (Darrah Aff. ¶ 18); "At no time while negotiating the Agreement did anyone from Athena visit CMS in North Carolina" (id. ¶ 19); "No principle member of Athena has visited North Carolina to conduct business with CMS" (id. ¶ 32); and "Athena has only made in-person contact with CMS in North Carolina once during their relationship to date" (id. ¶ 33). Even if Athena could not deny doing other business in North Carolina, it does not even attempt to describe that such business is still insufficient to support the exercise of general jurisdiction.

Meanwhile, Darrah acknowledges that Athena does business with other distributors. For example, he states, Athena "sells wireless medical monitoring products . . . both commercially and to the military through distributors" (id. ¶¶ 5, 6) and "[t]o date, all of the Agreements that Athena has entered into for the distribution of its products have included a forum selection clause" (id. ¶ 27).

Athena's acknowledgement that it sells its equipment through distributors and has entered into agreements with other distributors, Darrah's protestations of contact with North Carolina that are highly specific to CMS alone, and the complete absence of any attestation that Athena

30

does not do business in North Carolina other than with CMS suggest that Athena may, in fact, do business in North Carolina with distributors or others in addition to its relationship with CMS.

Although the entirety of CMS's argument in support of jurisdictional discovery is the purported "ample factual support and specific allegations concerning Athena's contact with the State of North Carolina" in CMS's Response to Athena's Motion to Dismiss (see Doc. #11 at 2), this is not a case where the defendant presented specific denials of general jurisdiction that the plaintiff would need to controvert in a substantive way.  While both parties could have presented a more developed argument in support of their positions, it appears to the Court that Athena has not opposed CMS's Motion for Jurisdictional Discovery in such a way that would require CMS to proffer more than it has in support of this limited discovery request and, in fact, some of Darrah's own averments suggest that Athena may do business in North Carolina other than with CMS.

Therefore, CMS's Motion for Jurisdictional Discovery is denied in part and granted in part.  It is denied as to "[d]iscovery related to the circumstances under which either party 'initiated' contact that resulted in the execution of the parties' Distribution Agreement" and "[d]iscovery related to the extent of the communications between Athena and CMS from

31

December 2009 to present." (See Doc. #11 at 2 requests (5) and (6).) However, CMS's Motion for Jurisdictional Discovery is granted as to requests (1) through (4) because those requests relate to the discovery of information about the exercise of general jurisdiction.

IV.

Because the Court has not found, at this time, that it can exercise jurisdiction over Athena, Athena's alternative motion to transfer venue pursuant to 28 U.S.C. § 1404 is denied without prejudice to refiling after jurisdictional discovery concludes.

V.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, for Transfer of Venue Pursuant to 28 U.S.C. § 1404 (Doc. #6) is denied without prejudice to refiling at the conclusion of jurisdictional discovery, and that Plaintiff's Alternative Motion for Jurisdictional Discovery (Doc. #11) is granted as to requests (1) through (4) only and denied as to requests (5) and (6).

This the 7th day of December, 2015.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

32